You may proceed. This is our second case of the morning. Diocese of Quincy v. Episcopal Church. For the appellant, Ms. Costell. Is that your correct pronunciation? And for the appellee, Mr. Brenner, you may proceed. May it please the Court, Mary Costell for the Episcopal Church and the Episcopal Diocese of Chicago. I'd like to make three points today. The first point is that this case never addressed certain interests in parish-owned property, and it was clear throughout the litigation that that was the case. The lawsuit was about an account at PNC Bank, and the question was, who had certain interests in that account? The Episcopal Church and its Episcopal Diocese of Quincy, on the one hand, or the Incorporated Diocese of Quincy and the Trustees Corporation, on the other hand. It was undisputed and established early on by the plaintiffs, who are the appellees here, that the account at PNC Bank contained 38 distinct funds. Twenty-three of those were owned by the Diocese of Quincy. Fifteen of those were owned by or restricted for the parishes and missions of the diocese, and they were held by the diocese as custodian. So the question in the lawsuit has been throughout, which of the two groups, again, the Episcopal Church and its diocese on one side and the Diocese of Quincy and the Trustees Corporation on the other, which of those two groups was entitled to hold itself out as the Diocese of Quincy and own the property owned by the diocese? And so with regards to the funds, the 23 of the distinct funds held at PNC Bank. And at most, which of those two groups was entitled to act as custodian of the property owned by the parishes and missions, but held by PNC Bank in the name of the diocese? What was never litigated in this case was as to parish and mission ownership interests. Do the Episcopal Church or the Episcopal Diocese of Quincy, now merged into the Episcopal Diocese of Chicago, have a legally enforceable trust interest that runs against the parish and mission ownership interests? Now that's a critical question as recognized throughout this case because of the church's trust canon, also called its Dennis canon, which states, which is a church rule that was adopted in 1979 shortly after the U.S. Supreme Court issued its decision in Jones v. Wolfe, which states in relevant part, All real and personal property held by or for the benefit of any parish, mission, or congregation is held in trust for this church in the diocese and the diocese thereof at which such parish, mission, or congregation is located. So what was not litigated was does the Dennis canon give the Episcopal Church and the Episcopal Diocese a legally enforceable trust interest that runs against parish and mission owned property? It was never litigated here and it couldn't have been because the parishes and missions were not even parties. So as to the 23 funds owned by the diocese, this case has resolved everything. We're not contesting that. But as to the funds owned by the parishes and missions, at most all this suit did was resolve which of the two groups could act as custodian for those funds until we could litigate the parish-owned funds and whether there's a trust interest that runs against them, which is what is issued in the Peoria lawsuit. Now with the initial litigation was this distinction made between these funds and the ownership interest? Yes. And how so? So plaintiff's complaint talked about the rights, sought resolution of the rights and liabilities of the parties hereto. The parties were only at that point the diocese corporation and the trustees on one hand and the Episcopal Church. Later on the Episcopal Diocese of Quincy of the Episcopal Church came in. But parishes were never parties. And then shortly after that. So should they have been? Should they have been parties? Yes. No. You're saying this was their interest? They have an ownership interest in those funds, yes. But they were not parties and they should not have been because that was carved out of the lawsuit. That was expressly carved out of the lawsuit. So what happened after plaintiffs filed their complaint was that they filed a motion to seek an order releasing part of the funds which had been frozen by PNC Bank. And they said the monies presently held by National City Bank, which was National City Bank then, include approximately 38 funds, 15 of which are owned by or restricted for the use of the churches, parishes or missions which comprise the Diocese of Quincy. These monies are commingled in the pool endowment fund with diocesan assets. Shortly after that we filed our counterclaims. The Episcopal Church and then the Diocese of Quincy of the Episcopal Church filed counterclaims and intervention and sought resolution of issues involving all property held by or for the incorporated diocese. The plaintiffs, appellees here, filed a motion to dismiss our counterclaims stating that they substantially increased the extent and scope of the dispute. Now we hadn't talked about any, parishes and missions own lots of other property that aside from the 15 distinct funds held at PSC Bank. They own real estate, they have separate bank accounts. All those, they had not been mentioned in this lawsuit and they were never part of this lawsuit and they're all part of the Peoria County lawsuit which includes, in our view, the 15 disputed funds. So there was a motion to dismiss on the basis that our counterclaims had expanded the lawsuit and our response was no, this lawsuit has from the beginning only been about diocesan property. And the trial court, having heard from both sides, dismissed, denied the motion to dismiss our counterclaims. Does that answer your Honor's question? It does, but I guess what I'm wondering is, you know, it never dealt with the parish funds, then why the request to freeze, you know, those funds as well, I mean all the money and that was part of it. Well, when we first sent the letter to PNC Bank, we did not have, our diocese and we, the Episcopal Church, didn't have any information about the funds or the commingling of the funds or the character of that fund. So when we wrote, we knew they held some funds and we knew they were in the name of the Diocese of Quincy, but there was no way for us to know that that included funds that were owned by parishes and missions. Now, what was still at issue in that lawsuit was which party could be the custodian. So we had two groups of people who were asserting that they were the Diocese of Quincy. One was a group represented by the plaintiffs who had left the Episcopal Church and claimed to have taken the diocese out of the church. And one was a group, a minority group of loyal Episcopalians who said, no, you didn't take the diocese out of the church and it's still an Episcopal diocese. And that was at issue in the lawsuit. And so both sides were arguing that they should be the diocese and as diocese be custodian on behalf of those parishes, holding the funds for the parishes and missions, but not owning them. So ownership interests in those funds were never at issue. Oh, no, I understand. Now, in addition to, Your Honor asked how do we know that the parish property wasn't part of the lawsuit. Well, it's in the pleadings, it's in the motion to dismiss, how that unfolded and how the court ruled. But we also know from what the trial court said and then ultimately the way this court ruled. So the trial court at trial made a number of statements that reflected an understanding that we weren't talking about parish property ownership interests. So, for example, the court stated at one point, they, meaning the plaintiffs, are not trying to take out the parish property, are they? That's not what this is about. That's in the appendix, at our appendix at 66 and 67. At another point in the trial, the trial court stated the Dennis Cannon quote, and I'm quoting, is a totally compelling argument with respect to mission property or parish property. In its findings, opinion, and order, the trial court agreed, and this is when the trial court found in favor of the plaintiffs and appellees, agreed that the Dennis Cannon at most merely applies to parish or mission property. In other words, the Episcopal Church and its diocese lose in part because the Dennis Cannon did not expressly mention diocesan property. And the trial court also said that the Dennis Cannon does not apply to diocesan property in its final order in judgment. This court made the same distinction when it affirmed the lower court's decision. It said, the Dennis Cannon provides parish property, parish property emphasized, is held in trust for the diocese and the church and restricts a parish's ability to dispose of its property. However, it appears undisputed the church's cannons do not contain similar language with respect to diocesan property being held in favor of the church. So that appeared to be a dispositive distinction that this court drew, which suggests that it too understood that parish property ownership interests and trust claims that might run against those interests were not at issue. Can I stop you right there? Yes, Your Honor. Because when we affirmed the trial court's order initially, we said the property in question in this case consists of the funds in the national city account. Yes. We did not say a portion of the funds. Yes, that's correct. And to the extent that the funds that the diocese, and again we were disagreeing about who was the diocese, but to the extent that the diocese was holding funds as a custodian for the parishes or missions, it was contested which group could be the diocese keeping that custodial role. Well, furthermore, the Adams County Trial Court held, and we affirmed the Adams County Trial Court, they held in 2013, all disputed funds, money, endowments, and accounts held by national city are hereby declared to be owned by the diocese without any claim by the church. Yes, and the court did say that, although it did not define disputed funds. And when it's talking about the diocese owning, clearly the diocese doesn't own the 15 funds. It has said it doesn't own the 15 funds. It said in its motion for partial release of funds shortly after filing the lawsuit. You say the trial court didn't identify the funds, but previously I read to you a quote from our court which said the property in question in this case consists of the funds in the national city account. And basically that's what the trial court held too. Well, the trial court in that section of the opinion was talking about ownership. And yes, the ownership was different. There are 38 distinct funds, as plaintiffs made clear. There are 38 distinct funds, 23 owned by the diocese. And of course our dispute was over who got to be that diocese, and we lost that. But as to the 15 separate funds, to the extent we were litigating over which group got to be the diocese and therefore got to be the custodian of those funds. So that's our position. So in sum, our view is that the case never encompassed parish property interests. That it was clearly carved out early on. And the question of whether the Dennis Cannon gives the Episcopal Church and its Episcopal Diocese a trust interest in parish property is still an open question. It couldn't have been litigated because the parishes were not there. Could not have been litigated. Judge Polk has said 100%. That's what the order says. We affirm. Judge Drummond looks at it again and says 100%. How is it that you did not correct that? Because it's clear. He didn't say, and I mean 100% of that which is diocese property. He said 100% of everything the bank holds. I think I would look at that and say, I'm not sure he understood what was carved out by the pleadings or what we think we were litigating. We need to ask for a correction, for a clarification, for an understanding. When you say Judge Drummond actually heard... Well, I'm saying... Okay, so you mean Judge... I'm sorry, I wasn't following you. Well, Judge Drummond looks back at what Ortdahl said and the fact that you didn't do anything after he entered the order or make any reference to it on appeal and said that's what it meant. But what he said in his order was the disputed funds are owned by the Diocese of Quincy, meaning the plaintiffs. And we had all agreed that what was owned by the diocese, we were disagreeing over who was the diocese, and we all agreed, no one disputed that the 15 funds weren't owned by the diocese. But when he enters the order he says 100% of everything the bank holds. He said the disputed funds. He said the disputed funds, money, endowments, and accounts held by National City are hereby declared to be owned by the diocese without any claim by the church. And we agreed that what's disputed as to ownership were the 23. To us that was clear. So what's left after you take into account disputed funds, money, endowments, and accounts, what's left after that? The funds that weren't disputed as to ownership. Are they money? Well, they're funds, sure. I'm not sure I understand Your Honor's question. I guess to me it boils down to if you say all, is there anything left after all? But all is not in that sentence, Your Honor. Well, but it says disputed funds, money, endowments, and accounts. I just don't really see what's left after that. Well, we were litigating this case from the beginning through the lens of understanding early on from the plaintiff's own pleading that only 23 of the funds were owned by the diocese, and we were talking about diocesan owned property. And so that the 15 funds that they carved out early on in the case were at most what we were litigating was who could be the custodian for those funds. And that's what we understood throughout the case. And we didn't think that Judge Ortbal's order changed it because it used the word disputed funds and talked about ownership. We all agreed we were disputing who got to own the 23 funds, the 23 distinct funds. That's how we understood it. Are they distinct? Yes. I thought the bank said they were commingled. Well, yes, but the diocese has called them distinct. I mean, the plaintiff's diocese has called them distinct. But now we don't think they are? Well, as far as I know, they are, Your Honor. Well, then what did the bank mean when they said they're commingled? They did say that, didn't they? I believe the bank said they were commingled. Okay. Yes. The second point that I'd like to make is that the trial court on the motion to enforce both barred us from contact with PNC Bank to create any freezes but also from litigating our positions in Peoria County. And I want to take that second one on first. It's our position that nothing in this lawsuit would preclude us from litigating in Peoria County. But if we're wrong about that, it's for Peoria County Court to decide that we've hit a race judicata wall or a collateral estoppel wall. It's not appropriate to order us to cease and desist from prosecuting our claims in Peoria County. And, in fact, at the end of that hearing, our local council immediately got on the phone with Peoria County to pull down a hearing that we had to try to protect the funds through a preliminary injunction hearing. And we believe that's an improper use of Rule 137. Finally, to my third point. And on this point, I would just like to talk about that we believe the sanctions are inappropriate for a variety of reasons. I would like to note first with regret that we made a factual error in our reply brief and we filed this morning a statement, just became aware of it over the weekend. We stated on page six of our reply brief that the attorney's fees have been paid. In fact, we posted an appeal bond in an amount, I don't know, around $5,000 more than the attorney's fees. And so we filed a statement this morning with the court making that correction and we apologized to the court and opposing counsel for that mistake. So my third point is sanctions in this situation were inappropriate. Does this mean five minutes? It did about two minutes ago. Okay, thank you. You'll get a red light when your time's up. Okay, thank you. Okay. Rule 137 allows sanctions only when the party's filing is not well-grounded in fact and warranted by existing case law. Obviously, if the court agrees with us in the construction of the original order, then our position was well-grounded. Even if the court disagrees, we stand here in good faith, expressing what we have thought about this case from the beginning and believe that our conduct does not rise to the level of requiring or permitting sanctions. Secondly, Rule 137 allows sanctions only for court filings in the same action. The letter to PNC Bank obviously was not a court filing, and our PRA case filings were not filings in this action. Thank you, Counsel. We'll hear from you on rebuttal. We'll hear from you on rebuttal. Thank you. May it please the Court. Ms. Kostel, I'm Tad Brenner. I'm representing the Diocese of Quincy and Bishop Alberto Morales. This case is essentially about enforcement of a judgment, not only of the trial court, but the opinion of this court as well. I'd like to essentially make three points. First, that the orders of the trial court and the opinion of this court are exceedingly clear. Second, there was no good faith basis for violating those court orders. And lastly, that sanctions are appropriate in this case. Judge Drummond's decision, which is the basis for this appeal, at least the oral decision, starts off with the words, I'm not confused by this, it's exceedingly clear, or something to that effect. Bottom line is the trial, which lasted three weeks, had at issue two pieces of property, one bank account, and one piece of real estate. The only thing we're talking about here is that one bank account. Now, the Episcopal Church is claiming that the trial court, Judge Drummond, somehow or another, expanded the original order of Judge Ortahl and the opinion of this court, or that somehow or another an exception was carved out. The bottom line is we were always dealing with one bank account. And if we look at the Episcopal Church's brief on page six, it even concedes that point. It says the original order includes the entire sum of monies held by PNC Bank, including the 18% that they are claiming was not included. There's no ambiguity in anything here. And we can look at the trial court's order. The trial court specifically said that the Diocese of Quincy had title and ownership of the bank account. It stated that the agency agreement between the Diocese of Quincy and National City Bank did not provide any interest to the Episcopal Church. Let me ask you a question. Your pleadings began the original litigation. Is that correct? That's correct. If your pleadings did mention parish admission funds, if they did, were you surprised that Judge Ortahl gave you 100% of everything in the bank? If at that point it was understood or believed that some of those dollars were for parish admission funds? Well, number one, I was not surprised by that ruling since it was one bank account with co-bingled funds. What the diocese had done was saying that a certain percentage go to St. George's Church in Macomb, a certain percentage is for another church, a certain percentage. So it was kind of internal accounting within that one bank account. They were never separate funds. In terms of the complaint filed by the plaintiffs, it asked the court to adjudicate the rights and liabilities regarding the funds. The record citation on that would be C32 through 38. So I think that framed the issue from the very get-go. On page 32 of a 15,000-page record, if we want to go even further and look at the defendant's counterclaim, they asked the court to declare the rights of all property. That's their phrase, which is found at C468. If we look at their amended answer, it says that each diocese exercises jurisdiction over its own churches. That's at C305. I can't see from the pleadings themselves where anyone considered all to be less than all. The pleadings framed the issue. The orders from both the trial court and this court are very, very clear. They say that the Diocese of Quincy owns this bank account. The findings are that the Episcopal Church has no interest, trust, or otherwise in any portion of this bank account. I have a hard time seeing where that is in any way ambiguous. If we want to look at the pretrial motions, the plaintiff filed a motion for partial release of funds. It asked before trial that some of the funds be released to some of the individual churches. Why would the plaintiff file a motion like that if the plaintiff did not believe that those funds, and I put that in quotation marks, were at issue? The Episcopal Church opposed that motion. If those so-called funds were not at issue, why would they oppose it? Then if we look to see what Judge Ortval did, he allowed under certain conditions release of some of the money to individual churches, provided that certain conditions were made. Judge Ortval obviously felt that those so-called funds were at issue. If we look at the post-trial motions filed by the Episcopal Church, we have the same situation in its post-trial motion in the trial court. The Episcopal Church says, absent a stay, the petitioner or plaintiff can use and distribute any and all funds. As the court just pointed out, there was never a post-trial motion to clarify or reconsider regarding whether the trial court's order was for all or just a portion. The trial court said all, and the Episcopal Church never asked for clarification. In another post-trial motion filed with this court, the Episcopal Church says, the effect of the judgment was to give, quote, control of those funds, unquote, to the Diocese of Quincy. Obviously, they felt that all meant all. One bank account, one bank account awarded to the plaintiff. That's all there was to it throughout the history of this 15,000-page record. Now, what is disturbing is there was no suggestion that this one bank account should be piecemealed until December 30, 2014, and that's when the Episcopal Church sent a letter to PNC Bank, essentially claiming they still have an interest in that one bank account and even worse, threatening PNC Bank, a party to this case from start to finish, with litigation should they distribute any of that. Which brings me to my second point. I don't see any good faith basis for violating the orders of the trial court and the opinion of this court. All means all. That's all there is to it. But as this court may recall, this case began in January of 2009 when the Episcopal Church sent a letter to National City Bank. That letter claimed the Episcopal Church had an interest in that one bank account. After this case goes through a three-week trial, an appeal before this court, a petition for leave to appeal to the state Supreme Court, and one day before the mandate is to issue by the Illinois Supreme Court, another letter gets sent to the bank telling them don't distribute the money and if you do, we'll sue you. That is a threat to a party. And as stated before, I believe and we believe that the orders of this court and the trial court were absolutely clear. What makes this situation worse is while the Diocese of Quincy has a motion to enforce the court order pending, the Episcopal Church files a motion for preliminary injunction in Peoria County. Essentially what is happening is the Episcopal Church is asking another circuit court in another county, in another appellate district, to overrule what has already happened here. I can't see any good faith in that. They do not go back to Adams County and ask for clarification. Instead, they go to a different appellate district to ask for the same relief which they had denied in Adams County. Judge Drummond made specific findings in his order and those findings were that the Episcopal Church had acted in bad faith. He makes his findings at C8025 and 26. And those findings are pretty darn clear. And since we do have findings, I believe that the standard of review would be abuse of discretion. I do not see any abuse of discretion here. Mr. Brenner, the diocese didn't file a petition for indirect civil contempt with the trial court in Adams County, did it? That's correct. The language was a little bit loose. The motions to enforce asked for enforcement of the judgment and for sanctions. It was generic language that was used by both Bishop Morales as well as the Diocese of Quincy in its motion. And then Judge Drummond issued Rule 137 sanctions. But when you look at the text of Rule 137, it appeared to me that it requires that the petition for sanctions be filed in the litigation where the pleading was filed that's objectionable. Yes. And where I think the 137 comes from, it's the plaintiffs that filed the motion to enforce. But the Episcopal Church responded to that motion in writing, signed. So I believe that the response is subject to 137. Particularly when it basically admits everything that was said in the motion to enforce. It attaches a copy of its motion for preliminary injunction filed in Peoria County. It basically brings in the Peoria action into the Adams County case through their own pleadings. So I believe that 137 is appropriate. It was not specifically asked for by the plaintiffs. But weren't you seeking to sanction them for filing for the preliminary injunction in Peoria? No. Not for their response to your motion for enforcement? The motion to enforce was essentially that the Episcopal Church kept the diocese from accessing its own funds through its conduct with National City Bank. The pleadings are what bring it within the realm of 137, or at least that's how I see it. Now, in terms of indirect civil contempt, the Episcopal Church raises the issue that there needs to be an evidentiary hearing. I'm not sure if I agree with that because the conduct in question first was completely undisputed. Second, it was confessed in pleadings and in argument. So what would be the point of having an evidentiary hearing when everything is in the record before the court? But we're not dealing with a petition for indirect civil contempt. That's correct. But I believe 137 is appropriate where pleadings are signed which essentially admit the conduct of violating a court order and asking PNC Bank to violate a court order at least for a period of about two months, preventing the diocese of Quincy from having access to anything. Based on the totality of this situation, I believe the sanctions are very, very appropriate. We would be asking this court to affirm Judge Drummond's ruling, first in enforcing the orders of the trial court and the opinion of this court, and also in terms of imposing sanctions. Thank you. Rebuttal? Thank you, Your Honor. A couple of points. On the motion for partial release of funds, the Church and the Episcopal Diocese did oppose the release of funds and the motion did include a request for release of funds that were parish-designated funds, but they requested release of those funds to the plaintiffs and not to the parishes. That's at C-371 of the record. And that precisely was our objection, was that we did not believe that the plaintiffs were appropriately the diocese, the custodians, who should get the release of those funds. The argument that the Church agreed that the court had found that the diocese, that the plaintiff diocese controlled all the funds, that again doesn't contradict our argument because as custodian, they did win control of the funds. A controlled interest is not the same thing as an ownership interest. On allegations of bad faith, first of all, I'd say that good or bad faith was disputed. That was not undisputed before the trial court, obviously. And to give the court a little more background on what actually happened, and this is all in the record, starting at C-7863, there's an email exchange shortly before the mandate issues in this court on the affirmance. We reach out to counsel for the other side to talk about this 18% issue, 18% of the funds, and there's a cordial email exchange around that issue from the other side saying nothing about a motion for enforcement or sanctions, saying that if we're going to reach out to PNC Bank, that we make clear that we're not talking about the 82%. The December 30th rolls around and we haven't resolved anything, but we're still hoping we're going to work things out without involving courts, either the Adams County Court or the Peoria County Court. But the 30th rolls around, we write a letter to PNC Bank saying we still have the position that the 18% is not to be released, making clear we're not talking about the 82%. There are further emails back and forth on the 7th and 8th of January, and then as far as we're concerned, out of nowhere on the 14th, plaintiffs filed this motion to enforce the judgment. And for sanctions, we then go to Peoria and file our motion for preliminary injunction. As it turns out, we then pull away our letter from PNC Bank, and on February 3rd, they issued a letter saying we're releasing all funds with our agreement that we will not enforce against them if that was an error. And nevertheless, the motion to enforce the judgment goes forward. So to the extent there's any argument that this was a civil contempt proceeding, the PNC Bank issue has been alleviated, and civil contempt sanctions are only appropriate to coerce behavior. The court's questions about Rule 137 bring to light Apelli's argument that the pleading for which we were sanctioned was the pleading that we filed in defense of the motion of what was essentially a Rule 137 motion. And that would beg any kind of rational examination that you can't defend yourself when you're accused of violating a court order by telling the full truth. And so that obviously fails as a basis for sanctions under Rule 137. A final point is that it's been said that the Episcopal Church and the Episcopal Diocese took no steps to protect the parish and mission property until we contacted PNC Bank in December. That's not true. We had filed a Peoria County lawsuit in November of 2013. Unless the court has any further questions, thank you for your attention, and we urge the court to reverse on those. Thank you. We take the matter under advisement and await the readiness of the next case.